No. 02-182

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 182

IN RE THE MARRIAGE OF

ANNETTE S. HAINES,

        Petitioner and Appellant,

    and

RICKY L. HAINES,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone,
Honorable Russell C. Fagg, Judge Presiding

COUNSEL OF RECORD:

        For Appellant:

            Stephen C. Mackey, Towe, Ball, Enright, Mackey & Sommerfeld,
P.L.L.P., Billings, Montana

        For Respondent:

            Christopher P. Thimsen, Attorney at Law, Billings, Montana

                     Submitted on Briefs:  June 6, 2002

                             Decided:  August 27, 2002

Filed:

            _____
                     Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Annette S. Haines (Annette) appeals from the Thirteenth Judicial District Court's decree of dissolution. We affirm.

¶2 We re-state the issue on appeal as follows:

¶3 Did the District Court err when it granted Annette a maintenance award of $1,500 per month for four years following dissolution?

FACTUAL AND PROCEDURAL BACKGROUND

¶4 Annette and Ricky L. Haines (Ricky) were married on April 10, 1976. At the time of the dissolution, the parties had been married nearly 26 years. Two children were born during the marriage, both of whom had attained majority before these dissolution proceedings.

¶5 When Annette and Ricky were first married, they lived on a ranch in Utica, Montana, where Annette was a homemaker for one year until she obtained a minimum wage position at a grocery store. Thereafter, the parties farmed together in White Sulphur Springs and Forsyth. When the farm in Forsyth was sold, they moved to Roundup where Annette worked part-time in a bar.

¶6 In 1984, the parties moved to Billings after Ricky was injured working at a mine. Ricky attended May Technical School where he completed the broadcasting program and became employed at Northern Broadcasting Systems. While he attended school, Annette was the primary caregiver for the children and worked part-time for an inventory company earning $7.00 per hour to help support the

Comment [COMMENT1]: Tr 4

2

family.  In the late 1980's, she left this employment to attend May Technical School for one year and obtain a certificate in business.

¶7  Upon completing her degree, Annette was employed at Billings Livestock for three years.  Initially, she worked part-time and earned $6.00 per hour.  She was later hired full-time, and ultimately she advanced to the position of office manager and was compensated at $2,000 per month.  Annette left this position to work as a computer trainer for Sale Time Systems, a computer company which sells livestock auction programs.  This position paid, at most, $2,000 per month and required considerable travel. Since Ricky's position with Northern Broadcasting required him to travel 65,000 to 75,000 miles per year, the parties decided that Annette should terminate her employment to be available for their children who were ages twelve and fourteen at the time.

¶8  Annette worked as a homemaker and worked part-time in various office positions and in skin care product sales for approximately $8.00 per hour.  She worked part-time for Millennium Engineering at $9.50 per hour, or a monthly take home of $1,028, until she was laid off a few months prior to the trial in this case.  Through Kelly Temporary Services, Annette obtained a temporary full-time position as an accounts receivable clerk at a computer company. She anticipated working for Kelly for six months during which time the computer company had the option of permanently hiring her.  The job paid $7.00 per hour and did not provide any health or retirement insurance benefits.

3

¶9    At the time of trial, Ricky had been employed as the Western Division Ad Director of Northern Broadcasting Systems in Billings for fifteen years.  Ricky earned $51,000 in 1995 and steadily increased his earnings to $86,000 in 2001.  Ricky had medical and retirement benefits and bonuses through this employment.  He also earned income from speaking engagements, including approximately $4,000 in the year 2000, and he received approximately $8,000 from the sale of a book that he authored.

¶10   In March 2001, Ricky moved to Twin Falls, Idaho, to develop a market for Northern Broadcasting Systems.  As part of a compensation package, he was to earn a base salary of $54,000 plus a guaranteed $32,000 in commissions for the first year.  Commencing in March 2002, Ricky was to receive his base salary plus the standard 15 percent sales commissions.  Ricky's projected sales commissions for the year 2002 were $22,500, for a total projected income of $76,000.  Ricky's speaking engagements dropped off in Idaho due to his lack of name recognition in the area.

¶11   After trial, the District Court issued its Findings of Fact, Conclusions of Law and Decree.  The court found that Annette's monthly expenses totaled $3,143, but that they would be reduced by $400 per month after the sale of the family home.   The court found that Ricky's expenses totaled $2,485 per month. The court valued the net marital estate at $71,717.  It awarded Annette an estimated amount of $15,000 from the sale of the family home; a car worth $6,000; Ricky's Merrill Lynch retirement account valued at $24,400; and half of the household goods for a total award of

4

$52,400.  The court allotted no debt to Annette.  With regard to Ricky, the court awarded him $39,000 of the marital estate and $27,583 in marital debt, for a total award of $11,417.

¶12  The District Court ordered Ricky to pay maintenance to Annette in the amount of $1,500 per month for a period of four years.  The court found that Annette was 47 years old and in good health.  It found that she had considerable work experience and is capable of working full time.  The court also found that she had recently obtained employment in which she would earn $1,048 per month net. The court stated that "after four years [Annette] should be self supporting."

¶13  Annette does not contest the net worth valuation, the distribution of assets, or the amount of maintenance awarded.  She does contest, however, the District Court's limitation on the duration of maintenance.

DISCUSSION

¶14  Did the District Court err when it granted Annette a maintenance award of $1,500 per month for four years following dissolution?

¶15  The standard of review for maintenance awards is whether the district court's findings are clearly erroneous.  *In re Marriage of Smith* (1995), 270 Mont. 263, 269, 891 P.2d 522, 526.  The amount and period of maintenance must be determined in accordance with § 40-4-203(2), MCA.  The factors to be considered are:

> (a) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of

5

a child living with the party includes a sum for that party as custodian;

    (b) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

    (c) the standard of living established during the marriage;

    (d) the duration of the marriage;

    (e) the age and the physical health and emotional condition of the spouse seeking maintenance; and

    (f) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

¶16 On appeal, Annette argues that the District Court's determination that she would be able to support herself in a manner similar to that enjoyed during the marriage within four years from the date of trial is not supported by the record. She maintains that any assumption that she would be able to replace the monthly maintenance with earnings or return to a management position "was based upon speculation and hope." Annette contends that Ricky has a superior ability to acquire wealth in the future to meet his own needs and provide permanent maintenance to her. Citing several cases in which permanent maintenance was awarded, including *Bowman v. Bowman* (1981), 194 Mont. 233, 633 P.2d 1198, Annette insists that the District Court should have awarded permanent maintenance in this case.

¶17 Ricky disagrees. While he concedes that maintenance is necessary, he disputes that Annette requires permanent maintenance. He contends that the evidence showed that both parties had the same level of education, were the same age and in good health. He claims that Annette, through her excellent job skills in computer operation, office management and bookkeeping, had in the past

6

accepted positions and rapidly advanced to management level. He faults Annette for failing to give the District Court a plan for further education or job training. He emphasizes that while Annette left the marriage debt free, Ricky left the marriage with all of the marital debt, very little equity, a good although tenuous job and a maintenance obligation. Under these circumstances, Ricky claims that the District Court appropriately determined that four years of maintenance would allow Annette to become adequately employed to support herself.

¶18 After considering the evidence and the District Court's written and oral findings, we conclude that the District Court properly considered each of the factors under § 40-4-203(2), MCA, and that substantial evidence exists to support the court's findings. The court noted that the parties had a long-term marriage. The court reviewed Annette's and Ricky's financial resources and found that Annette received the bulk of the marital property, including the equity in the family home and Ricky's retirement account, and that she left the marriage with no debt. Nevertheless, the court found that Annette's current employment was insufficient to meet her needs in light of the parties' standard of living during the marriage and, consequently, an award of maintenance was appropriate. Given the distribution of the marital estate as well as Annette's relatively young age, good health, work history and skills and abilities, the court found that in four years Annette could acquire sufficient job training and employment to enable her to become self-supporting and increase her standard

7

of living. The court found that Ricky had the potential for higher earnings in the new Idaho market and that he could, while living frugally, meet his needs as well as the maintenance obligation.

¶19 Moreover, the cases Annette cites supporting the award of permanent maintenance are inapposite. In *Bowman*, the appellant wife had primarily worked as a homemaker during the marriage. *Bowman*, 194 Mont. at 235, 633 P.2d at 1199. She attended college courses to obtain a degree in economics but had not completed her degree at the time of the dissolution. The District Court awarded her maintenance in the amount of $1,500 per month to terminate in two years on her graduation date. *Bowman*, 194 Mont. at 235, 633 P.2d at 1199.

¶20 We reversed. In doing so, we quoted extensively from the testimony of a career planning and placement counselor who stated that the appellant, as an older woman with a college degree entering the labor market for the first time, would face a very competitive job market. *Bowman*, 194 Mont. at 238-39, 633 P.2d at 1201-02. In addition, we considered the fact that the parties had achieved a relatively high standard of living during the marriage. *Bowman*, 194 Mont. at 239, 633 P.2d at 1202.

¶21 Here, there was no similar testimony that Annette would not be able to obtain sufficient full-time employment. In addition, unlike the appellant in *Bowman*, Annette is not entering the labor market for the first time. Indeed, she has worked in several part-time and full-time positions, including a management position at a computer company. Furthermore, unlike the situation in *Bowman*,

8

Annette described the parties' standard of living as middle class. Finally, we have approved awards of temporary maintenance where petitioners received greater portions of the marital estate. *See In re Marriage of Herman* (1990), 245 Mont. 451, 802 P.2d 623. Accordingly, under the facts of this case, we cannot conclude that *Bowman* is controlling.

¶22  The other cases Annette relies upon are also distinguishable. *See In re Marriage of Edwards* (1985), 215 Mont. 512, 699 P.2d 67 (wife awarded permanent maintenance when evidence supported conclusion that wife could earn only $200 per month); *Marriage of Cromwell* (1979), 180 Mont. 40, 588 P.2d 1010 (wife trained as nurse awarded permanent maintenance when she was not awarded any of tenured professor's substantial retirement account and testimony established the competitiveness in the nursing field).

¶23  We have recognized that district courts face a considerable task in determining a maintenance award. *Herman*, 245 Mont. at 454, 802 P.2d at 625.  We have also stated  that, in the final analysis, it is not a question of whether we could be persuaded to reach a different conclusion after considering the same evidence.  Rather, the test is whether the district court had adequate evidence to support its conclusions.  *In re Marriage of Bross* (1993), 256 Mont. 174, 179, 845 P.2d 728, 730-31.  Here, we hold that the court's findings are supported by substantial evidence and are not clearly erroneous.

¶24  We affirm.

/S/ W. WILLIAM LEAPHART

9

We concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE

10