Justice Jim Rice delivered the Opinion of the Court.
*529 ***124 ¶1 Sonia Frank (Sonia) appeals from the Fourth Judicial District Court's decree of dissolution of the marriage between her and Brian Frank (Brian), distributing marital assets and awarding Sonia five years of spousal maintenance. We address the following issue, and affirm:
Did the District Court abuse its discretion in determining the amount and duration of the maintenance award granted to Sonia?
FACTUAL AND PROCEDURAL BACKGROUND
¶2 Sonia and Brian were married in 1987 in California. Brian petitioned for dissolution in February 2016, and the District Court ***125 entered a dissolution decree in February 2018. At that time, both parties were 50 years old and in good health. They had three adult children and resided in Whitefish, Montana.
¶3 Brian and Sonia both attended some college, although neither graduated. In 1987, prior to their marriage, Brian, along with his father, Gerald Frank, and his step-mother, Tina Hansen Frank, incorporated a business in California called Hansen and Frank, Inc., to sell nutritional supplements to endurance athletes. Capital contributions from Gerald primarily financed the company, but Brian personally contributed $ 35,000. Early in their relationship, Sonia assisted at the company by answering phones and filling orders, but significantly decreased her involvement after the birth of the couple's first child in 1988. Brian inherited the company after his father's death in 1991. Sonia became an officer and director of the corporation, and invested $ 15,000 into the company, but except for her daily conversations with Brian about human resource and personnel issues, Sonia focused on being a homemaker and raising the couple's three children.
¶4 Brian and Sonia moved to Whitefish in 1995 to raise their family and operate the business there. Hansen and Frank, Inc. was dissolved in 1996, and after two corporate restructurings, became Hammer Nutrition, Ltd., as it is known today.[1] The company remains focused on selling nutritional supplements. Following the last restructuring, Sonia was recognized as a 50% owner of Hammer Nutrition. As President, Brian grew Hammer Nutrition into a successful company. However, the company's gross sales steadily declined for five years prior to the parties' 2016 divorce and net income fell significantly. By the end of 2017, Hammer Nutrition was earning approximately $ 1,800,000 in annual net income, virtually all of which flowed to the Franks as personal earnings. During the two-year dissolution proceeding, Hammer Nutrition paid out almost all of its net profits to the parties and did not maintain an appropriate cash reserve for business contingencies.
¶5 During their marriage, Brian and Sonia accumulated a substantial estate, including the Hammer Nutrition business, real estate holdings, luxury vehicles, and other valuable personal property, ***126 such as jewelry, precious metals, artwork, wine, and firearms. The Franks also enjoyed a luxurious lifestyle that included travel, fine lodging and dining, and personal assistants. They experienced marital difficulties for several years prior to the divorce, and in 2012, Sonia filed for legal separation. The parties temporarily reconciled but continuing problems led to dissolution.
¶6 Historically, Hammer Nutrition carried a $ 1,000,000 line of credit with First Interstate Bank. In 2015, Sonia surreptitiously transferred over $ 800,000 from the company's business accounts into her personal account. These unauthorized withdrawals violated the bank's covenants because they created a deficit between the outstanding balance on the line of credit and the value of company assets upon which the credit was extended. Sonia refused requests from the bank to return the funds, so to remedy the imbalance, the Franks pledged three additional real estate properties as security *530 for the loan. Brian subsequently made other disbursements from Hammer Nutrition to himself. The District Court found: "The parties exercised sole control and discretion over the funds withdrawn. Each of the parties has thus already received an equal disbursement of funds from the marital estate. No further accounting of how these funds have been spent or maintained is necessary." The District Court also found that Sonia interfered with company affairs by these transactions and by firing a key employee, which created personnel problems for the company. After a pre-trial hearing, the District Court restricted Sonia's access to Hammer Nutrition property and limited her involvement to recognizing employees on special occasions and continuing her work on the employee handbook. In the same order, the court restrained Brian from coming within 500 feet of the family's home where Sonia was living.
¶7 Numerous exhibits and witnesses were presented at trial, including experts who opined about the value of Hammer Nutrition. The District Court found, based on expert testimony it found to be credible, that Hammer Nutrition was worth $ 5,910,000. The court determined "an equitable distribution of 50% of the marital estate to each party is appropriate," but that 10% of the value of Hammer Nutrition should be credited to Brian as premarital inheritance, thus reducing the value of the company to $ 5,319,000 for purposes of the marital distribution.
***127 ¶8 The District Court valued the total marital estate at $ 10,260,971.[2] Brian received full ownership of Hammer Nutrition, but in offset, the District Court ordered him to pay $ 2,088,717 to Sonia as an equalization payment, after also factoring in her other assets. Sonia received several vehicles, the precious metal holdings valued at $ 387,392, and approximately $ 1,951,167 in real estate equity, including two residential homes, a mountain condo, and two parcels of undeveloped land. Brian received a larger value than Sonia in vehicles, but less in real estate. Each party was generally permitted to keep other personal property they claimed or desired. Factoring in the equalization payment, each party received $ 4,834,986 in assets of the marital estate as valued by the court, after deduction of Brian's premarital inheritance.
¶9 At the time of dissolution, Sonia was unemployed and had not sought employment following the parties' separation. Sonia requested maintenance in the amount of $ 50,000 per month, totaling $ 600,000 annually, for the remainder of her life. Following the parties' separation, Sonia incurred over $ 37,000 in monthly credit card expenses, and estimated her future monthly expenses would be over $ 90,000 after accounting for the real estate mortgages and upkeep on the properties she was to receive. The District Court found Sonia's claimed expenses to be "unreasonable," and that, based upon her average life expectancy of 85, her maintenance request totaled $ 21,000,000. The District Court awarded Sonia maintenance in the amount of $ 15,000 per month for three years, and then $ 10,000 per month for two additional years, totaling $ 780,000 over the five-year period following the dissolution.
¶10 Sonia appeals the amount and duration of the maintenance award.
STANDARD OF REVIEW
¶11 We review maintenance awards to determine whether the district court's findings are clearly erroneous. In re Marriage of Haines , 2002 MT 182, ¶ 15, 311 Mont. 70, 53 P.3d 378. "A finding is clearly erroneous if it is not supported by substantial evidence, if the district ***128 court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake." Patton v. Patton , 2015 MT 7, ¶ 18, 378 Mont. 22, 340 P.3d 1242. Absent a clearly erroneous finding, we will affirm a district court's division of marital property and maintenance award unless we determine that the court abused its discretion. *531 Jackson v. Jackson , 2008 MT 25, ¶ 9, 341 Mont. 227, 177 P.3d 474. "In a dissolution proceeding, the test for an abuse of discretion is whether the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in a substantial injustice." Jackson , ¶ 9.
DISCUSSION
¶12 Did the District Court abuse its discretion in determining the amount and duration of the maintenance award granted to Sonia?
¶13 Sonia argues the District Court failed to properly consider the factors relevant to a determination of maintenance under § 40-4-203(2), MCA. A district court may grant maintenance "only if it finds that the spouse seeking maintenance: (a) lacks sufficient property to provide for the spouse's reasonable needs; and (b) is unable to be self-supporting through appropriate employment ...." Section 40-4-203(1), MCA. Then, a maintenance order "must be in amounts and for periods of time that the court considers just ... after considering all relevant facts, including:
(a) the financial resources of the party seeking maintenance, including marital property apportioned to that party, and the party's ability to meet the party's needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
(b) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
(c) the standard of living established during the marriage;
(d) the duration of the marriage;
(e) the age and the physical and emotional condition of the spouse seeking maintenance; and
(f) the ability of the spouse from whom maintenance is sought to meet the spouse's own needs while meeting those of the spouse seeking maintenance.
Section 40-4-203(2), MCA. Although all these factors must be considered by the district court, "it need not make a specific finding relating to each, provided that this Court can determine the trial judge ***129 actually considered each factor." Jackson , ¶ 23 (quoting In re Marriage of Rudolf , 2007 MT 178, ¶ 27, 338 Mont. 226, 164 P.3d 907 ).
¶14 Referencing all the factors, Sonia argues generally the District Court failed to consider the amount of time it will take for her to "overcome her lack of training and experience, her age limitations on the job market, and her lack of higher education, and find employment that will suffice for the needs and requirements of the lifestyle she and Brian were accustomed to during the marriage." We have categorized Sonia's sub-arguments as challenges to the District Court's consideration of the factors regarding, and the sufficiency of the evidence supporting: 1) her financial resources; 2) her employability; and 3) the overall fairness of the distribution given the duration and standard of living of the marriage. Brian subtly offers, "[a] credible argument in this case could be made" that a maintenance award to Sonia was not appropriate or necessary, but he did not cross-appeal the District Court's award of maintenance, and instead primarily argues the District Court's award was based upon findings of fact that were not clearly erroneous and that the court did not abuse its discretion in determining the award's amount and duration.
¶15 Sonia contends the District Court lacked evidence that her financial resources, including the five-year maintenance award, would be sufficient to meet her expenses and provide the same standard of living she and Brian achieved during the marriage. The District Court did not share Sonia's assessment of the expenses that would be necessary to meet her future needs. Noting that her living expenses "dramatically increased" after her separation from Brian and that the costs she claimed were "unrealistically high," the District Court ruled, "[i]n consideration of the statutory considerations set forth in MCA § 40-4-203 and Sonia's reasonable needs, her claimed expenses are unreasonable." The District Court emphasized that Sonia would be receiving "substantial assets," and reasoned that, in addition to the maintenance *532 award, Sonia could utilize these properties "to engage in opportunities for the acquisition of assets and income, including rental income and income from other related business activities." The District Court concluded that the substantial assets and maintenance award would be "sufficient to meet her reasonable needs."
¶16 Sonia argues that, beyond her acknowledgment that the properties are rentable, there was no evidence presented about the rental income potential of the properties. Further, she argues that an expectation she would rent her properties "significantly impacts her ability to use the assets awarded to her," thus impacting her standard of living. While additional evidence on the specific rental potential ***130 could have been helpful, there was no dispute between the parties that the properties were marketable, and Sonia's opinion was based upon her own experience ("I am very knowledgeable on property, in general, and know that [the] homes are rentable.") The District Court also considered that the estate distribution would put Sonia into a liquid cash position that would enhance her ability to invest and obtain a return. While the "standard of living" factor must be considered, it cannot be viewed in isolation or overemphasized, because the practical reality, as Sonia acknowledged in her testimony, is that two people cannot separately enjoy the same standard of living when living apart as they did while living together. The common phrase, "two can live as cheaply as one," may be true when joining forces, but not when dividing them. Although constrained by this reality, the District Court considered the Franks' standard of living and preserved it as much as possible through a careful distribution of the estate, reasoning, "[e]ach party will have significant assets following the Court's distribution, including the opportunity for the future acquisition of property." We conclude the District Court's findings, including general assumptions it made about the uses Sonia could make of the property at her disposal, were supported by substantial evidence and properly considered.
¶17 Next, Sonia argues the District Court failed to consider the challenges she will face in entering the job market in light of her age, lack of education, and the 30 years she spent supporting her marriage to Brian and their children, rather than developing marketable skills. She argues that it will take longer than the five years provided by the maintenance award for her to find appropriate employment to maintain the standard of living enjoyed by the parties during their marriage. See § 40-4-203(2)(b), (d), (e), MCA (requiring the district court to consider: (b) the time it will take for the claimant to obtain education or training to enable them "to find appropriate employment"; (d) the duration of the parties' marriage; and (e) the claimant's age and physical and emotional condition).
¶18 Sonia's argument again emphasizes the parties' standard of living during the marriage over the other factors to be considered and, as discussed above and noted previously, a court must consider all the factors under § 40-4-203(2), MCA. See In re Marriage of Harris , 252 Mont. 291, 297, 828 P.2d 1365, 1369 (1992) (holding that duration of marriage must be considered alongside the other § 40-4-203(2), MCA, factors and not be treated as "an overriding factor so as to preclude consideration by the District Court of other equitable reasons set forth in the statute for the award of maintenance" (internal citation and ***131 quotation omitted)).
¶19 As Sonia correctly points out, no specific evidence was presented to the District Court demonstrating what kind of employment she could obtain at her age and with her education, what she could earn, and whether she could sustain their prior standard of living. The District Court did note and consider that Brian and Sonia were both 50 years old, had been married for 30 years, and neither had earned a college degree. The court recognized that Sonia was "absen[t] from the labor market while participating as caregiver and homemaker for the family" during the marriage, which "allow[ed] Brian to more fully concentrate on the business." The court found that Sonia "is an educated, talented individual with capacity to obtain employment at a reasonable salary," that she "is in good health," and has no minor children to care for, but balanced these findings against the evidence, through Brian's testimony, that Sonia "has not been in the labor *533 market for a number of years and may require education or training to enable [her] to find appropriate employment." Sonia also testified to her employability, indicating she is capable of holding a job and possesses "certain management skills and H.R. skills" that she could utilize. Beyond the specific considerations of Sonia's employability, the District Court expressly based its determination that the parties were entitled to a fifty-percent share of the estate on its consideration of the § 40-4-203, MCA, factors, "including the length of the marriage, the age and health of the parties, employability, the contribution of each to the marriage and opportunity for future acquisition of assets and income." Thus, the record reflects that these factors guided the District Court in coordinating the property distribution and maintenance determinations, and led to its conclusion that the five-year maintenance award was "reasonable" and "an appropriate amount of time to obtain additional training and for Sonia to secure appropriate employment." We conclude the District Court's findings were supported by substantial evidence, including its finding, mentioned repeatedly, that Sonia was receiving "substantial assets" capable of generating income and of sustaining a standard of living reasonably commensurate with what the parties enjoyed during the marriage.
¶20 Finally, Sonia makes a multi-faceted argument that challenges the overall fairness of the decree's distribution of the marital estate. She argues the District Court violated § 40-4-203(2)(f), MCA, by failing to recognize that Brian could pay maintenance longer than five years while still meeting his own needs. She argues Brian should pay more maintenance because he was awarded Hammer Nutrition, which is an income generating asset, while she was awarded assets, such as the ***132 mountain condo, the lake house, and the residence in Napa, California, which will incur costs for maintenance.
¶21 Following trial, the District Court ordered Brian to pay Sonia $ 2,088,717 within sixty days as a cash equalization payment. This payment was calculated to offset the value of Hammer Nutrition, which the court awarded to Brian because he "has been the driving force in the development of Hammer Nutrition, is intricately involved in the business and its relationships with employees, vendors, consumers, dealers, distributors, financing and marketing, national and international connections." The value of Hammer Nutrition used to calculate the equalization payment to Sonia was determined after the District Court, in accordance with In re Funk , 2012 MT 14, 363 Mont. 352, 270 P.3d 39, awarded Brian a ten-percent interest in the company that he inherited prior to the marriage, reasoning that "[t]he credit for Brian's premarital and inherited interest is approximately $ 19,700 per year, a total of $ 591,000 over the 30 years of business operations, and is reasonable given the circumstances." This is a permissible consideration under Funk , ¶ 19 ("The party claiming ownership of the pre-acquired, bequested or gifted property is entitled to argue that it would be equitable to award him or her the entirety of such property. Accordingly, when distributing pre-acquired property or assets acquired by gift, bequest, devise or descent, the court must also consider the contributions of the other spouse to the marriage, and take account of the three factors set forth at § 40-4-202(1)(a)-(c), MCA."). The premarital credit decreased the portion of Hammer Nutrition available for division between the parties, which in turn, decreased the value of the equivalent estate distribution to Sonia. However, this was based upon a statute governing the consideration of premarital property as applied in Funk , ¶¶ 19, 32-34, and we find no abuse of discretion in this determination by the District Court.
¶22 Sonia argues that, given the court's distribution, Brian's estimated income demonstrates his ability to pay higher maintenance. She points out that, during the first three years following dissolution, she will be receiving $ 180,000 annually, or only ten percent of Brian's estimated $ 1,800,000 annual income. For the following two years she will receive $ 120,000 annually, or eight percent of Brian's estimated income, which she argues Brian can "likely" earn "in perpetuity." Sonia also points out that once Brian completes the ordered equalization and maintenance payments, he will have an additional $ 57,460 per month in unallocated income, *534 which Sonia argues demonstrates his ability to provide maintenance beyond five years.
¶23 The District Court came to different conclusions about Brian's ***133 ability to pay. Addressing Sonia's request for maintenance of $ 50,000 per month for the rest of her life, the District Court reasoned: "Brian's Final Disclosure Statement indicates that after taxes, conservative reserve to meet Bank loan covenants and contingent expenses, and living expenses substantially less than Sonia's stated expenses, together with the loan amount necessary to provide the equalization payment to Sonia, Brian's financial resources are exhausted. There is no ability for Brian to meet Sonia's excessive demands for maintenance, nor is the extensive time frame realistic or warranted." Regarding Sonia's claim that Brian would earn high income in perpetuity, the District Court also considered Hammer Nutrition's recent financial challenges, including five years of significant decline in sales, lack of retained earnings, increased competition from other retailers, and stricter regulations in the sports nutrition industry, in making its determination. Again, the record demonstrates the District Court considered the factors under § 40-4-203(2), MCA.
¶24 We understand Sonia's concerns that she faces future challenges to obtain the training and education necessary to secure appropriate employment, and to effectively manage the assets distributed to her to earn a return. She makes a well-supported argument for entitlement to a higher maintenance award. However, § 40-4-202, MCA, governs the distribution of marital assets and vests a district court with broad discretion to design an equitable apportionment of the estate. Jackson , ¶ 9. "Because district courts face a difficult task in awarding maintenance, our final analysis is not whether we would reach a different conclusion after considering the same evidence, but rather whether there is sufficient evidence to support its conclusion." Rudolf , ¶ 27. Our review for abuse of discretion leaves us with the conclusion that the District Court employed conscientious judgment, did not act arbitrarily or outside the bounds of reason, and did not clearly err in its findings. Jackson , ¶ 9.
¶25 Affirmed.
We concur:
MIKE McGRATH, C.J.
BETH BAKER, J.
INGRID GUSTAFSON, J.
JAMES JEREMIAH SHEA, J.

Hammer Nutrition is the trade or brand name of the business, which, for operational reasons, is comprised of seven separate business entities. For purposes of this appeal, the entities are treated as one company and are collectively referred to as Hammer Nutrition.

The District Court stated the value of the marital estate was "approximately $ 10,347,248," but utilized a table indicating the value was $ 10,260,971. This latter amount, less the $ 591,000 premarital inheritance the court credited to Brian, results in an amount of $ 9,669,971, which is the actual value of the combined tangible assets evenly distributed to Brian and Sonia.